UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JORGE LUIS SOSA,<br><br>                              Petitioner,<br><br>v.<br><br>LANDON BIRD AND ROB BONTA,<br><br>                              Respondents. | Case No.:22cv1022-JLS(BLM)<br><br>**REPORT AND RECOMMENDATION FOR ORDER DENYING (1) PETITION FOR WRIT OF HABEAS CORPUS AND (2) REQUEST FOR AN ORDER TO SHOW CAUSE OR AN EVIDENTIARY HEARING**<br><br>**[ECF No. 1]** |

    This Report and Recommendation is submitted to United States District Judge Janis L. Sammartino pursuant to 28 U.S.C § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.   On July 13, 2022, Petitioner, Jorge Luis Sosa, a state prisoner commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254.  ECF No. 1 ("Pet.").  Petitioner challenges the validity of his state court conviction for twenty-six sex crimes against his two grand nephews.  See Pet. Respondent answered on September 12, 2022.  ECF No. 4-1 ("Ans.").  Petitioner's Traverse was filed on October 19, 2022.  ECF No. 6 ("Trav.").

    This Court has considered the Petition, Answer, Traverse, and all supporting documents filed by the parties.   For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

**FACTUAL BACKGROUND**

The following facts are taken from the California Court of Appeal's January 22, 2021 opinion.  Lodgment 1.  This Court presumes the state court's factual determinations to be correct, absent clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts are entitled to statutory presumption of correctness).

1. Sosa's Abuse of IP and LS

Jorge Sosa was the uncle everyone loved. He was fun-loving, involved with his family, and supportive. Sosa had no children of his own, but maintained strong ties with his extended network of nieces and nephews. His house in Escondido was a gathering place, and it was not uncommon for Sosa and his long-term partner Robert to open their home to family members or friends who needed a place to stay. At various times, both the garage and the bar were converted into bedrooms to accommodate more people.

So when Sosa's niece Ivon found herself laid off after giving birth to her fifth child, she turned to her uncle, who had always been her confidant and a source of support. Sosa suggested she and the kids move to Escondido to live with him, rent free, until she got on her feet. He said it would be a new beginning for all of them. Ivon agreed.

They moved into Sosa's house in early 2011. Ivon and her infant daughter stayed in a bedroom while her two older daughters and two sons, IP and LS, slept in the converted bar. The family stayed until 2013, when Ivon leased an apartment just down the street. Even then, Sosa's house remained a central location in the children's lives. One of Ivon's older daughters, IH, lived there during her senior year in high school and the boys were regularly sent over to their uncle's house when Ivon needed childcare. Throughout the years, Sosa also helped Ivon financially. She accepted small loans from him, including $1,700 in 2017 [when] she needed to file for bankruptcy.

At some point after they moved into the house, Sosa began molesting IP. IP generally remembered that it happened "throughout middle school," but he also recalled incidents from the period when his family lived with Sosa and after they moved out. IP turned nine in the summer of 2011, so he could have been as young as eight when the abuse started. It continued until mid- 2016, and was only disrupted because IP moved to Los Angeles to live with his father. After that, Sosa turned his attention to LS. The younger boy was about twelve years old at the time.

For years, IP remained silent about the abuse; he was embarrassed and thought no one would believe him given Sosa's beloved status in the family.  He also noted that Sosa was "very nice" to Ivon and that "he helped us just a lot." But in early 2018, two events prompted IP to tell someone. The first was a holiday gathering where he learned from his cousin that his Uncle Patrick had also been abused by Sosa as a child. The second was a classroom conversation where IP's male teacher shared that he had been molested as a child. That same day, IP called Patrick to tell him what happened. Patrick assured IP it was not his fault and, at IP's request, called Ivon to tell her. While she was still on the phone with Patrick, Ivon asked LS if Sosa had touched him, and her youngest son nodded. The next day, Patrick drove down from Los Angeles with IP and they went with Ivon and LS to file a police report in Escondido. Within a few days, both IP and LS had forensic interviews to document their accounts.

Sosa was charged by the San Diego District Attorney with 27 counts in total; counts 1 through 25 concerned his abuse of IP, alleging oral copulation with a child 10 years or younger (Pen. Code, § 288.7, subd. (b)),[1] forcible lewd or lascivious acts on a child under 14 years (§ 288, subd. (b)(1)), and aggravated sexual assault of a child under 14 years (§ 269, subd. (a)). Only counts 26 and 27 addressed Sosa's abuse of LS, alleging lewd or lascivious acts on a child under 14 years, but without force (§ 288, subd. (a)). Most counts also included allegations of more than one victim (§ 667.61, subds. (b), (c) and (e)), and substantial sexual conduct with a child under 14 (§ 1203.66, subd. (a)(8)).

2. The Trial

LS, IP and Patrick all testified about Sosa's abuse. While no other family members witnessed anything inappropriate, IH did notice that Sosa "catered to the boys," took them on special outings, and generally paid more attention to them.

LS testified that Sosa touched him inappropriately once, likely sometime in 2017, after his brother moved to Los Angeles. They were in Sosa's bedroom with the door closed. At first, Sosa asked to see LS's pubic hair. Then he reached down LS's pants and touched his nephew's penis with his hand. Although LS initially reported to police that this happened twice, he only testified to one incident at trial.

IP recounted a much longer history of abuse. His uncle was a father figure whom he trusted and loved very much. Sosa started "touching" him after his family moved into the house. It happened "whenever we would be alone" and usually

---

[1] All further statutory references are to the Penal Code.

took place in Sosa's room.[2] He testified in general terms that Sosa orally copulated him often and typically touched his penis during these episodes, which happened more than once both while he lived with Sosa and afterward. He could not remember every time the abuse happened, but he did have distinct memories of some incidents: one that took place in the shower, one in his sister's room, one in the garage, and events that occurred the night before Sosa took him to the fair.

As to the shower incident, IP remembered one time when the other shower in the house was occupied by one of his siblings, so he went into the master bathroom—which was connected to Sosa's room—to shower. Sosa came in, reached into the shower, touched his penis, and told him he loved him and would not hurt him.

The garage incident took place after IP's family moved down the street. At his mom's instruction, IP went to Sosa's house one day after school to pick out a Halloween costume. Sosa took him to the garage where the costumes were stored and pulled out a box, but then took off IP's pants, held his arms down, and orally copulated him. He stopped when they heard Ivon's car pull up in the driveway. This was the only time something happened in the garage.

The incident in IH's room also occurred during this general time frame. IH moved back to Sosa's house during her last year in high school and stayed in the same room the children had previously shared. At some point, IP, Sosa and IH were all in that room when she left to take a shower. Sosa then held IP down on the floor, took off his pants, touched IP's genitals with his hands, and orally copulated him. IH came back briefly, apparently to retrieve something she forgot, and Sosa pulled IP's pants back up and pretended he had been tickling IP. IH never saw anything inappropriate take place.

In addition to these distinct events, IP also remembered instances when the abuse escalated. On at least three occasions, Sosa made IP engage in sodomy.[3] He used lotion on IP's penis and directed it to Sosa's "butthole"; this happened more than one time. IP did not provide granular details but did distinguish between the "butthole" and "outside of the butt" to indicate where his penis went. On one occasion, Sosa also used his penis to touch IP's butthole.

---

[2] Although Sosa's partner of more than 30 years also lived in the house, they slept in separate bedrooms.

[3] Sodomy is "sexual conduct consisting of contact between the penis of one person and the anus of another person." Although the conventional understanding of forcible sodomy might assume the victim as the person who was penetrated, the statute makes no such distinction. (§ 286, subd. (a).)

The last specific incident IP could remember took place the night before Sosa took IP and LS to the Del Mar fair in the summer of 2016. The boys spent the night, and IP was nearly asleep in the living room when Sosa got him up and pulled him into the bedroom. He stroked IP's penis with his hand, orally copulated him, and then touched IP's "butthole" with his finger. At that point, IP pushed his hand away and managed to leave. Sosa apologized. That same night, Sosa also made IP orally copulate him. This incident seemed difficult for IP to recount; he testified in general terms at the preliminary hearing that Sosa pulled his head toward Sosa's penis and tried to force copulation, but at trial he explained that was not how it happened. No physical force was used, he just trusted Sosa—who made him think it would be okay.

Patrick's account, which detailed three incidents from his childhood, was offered as propensity evidence. There were significant similarities between the type of behavior Patrick recounted and that reported by IP and LS. It started when Patrick was 8 to 10 years old. The first time, Sosa made Patrick expose himself, grabbed Patrick's penis and then masturbated in front of him. In the second incident, Sosa orally copulated Patrick while another cousin slept in the same room. Patrick was able to leave during the third incident before it went very far, but Sosa started by massaging Patrick with lotion and then apologized when Patrick got up and left.

Patrick's experience was broadly corroborated by his oldest child, who testified that her father relayed the story of his abuse to her before she and her siblings visited Sosa's house for an overnight. He told her so she could keep an eye out for her younger siblings during the trip. For his part, Patrick remembered this conversation differently. He thought he talked to all of his children about molestation to help them be aware of what could happen and disclosed his experience with Sosa to demonstrate that "sometimes it's the people that you least expect." Generally, Patrick thought his abuse was an isolated relational dynamic and gave Sosa the benefit of the doubt that he would not repeat the behavior.

The defense witnesses included Robert (Sosa's partner), Oscar (another nephew), Theresa and the defendant. Oscar and Theresa both lived in the house after IP and LS moved out and never observed inappropriate conduct between Sosa and the boys. Oscar also lived with Sosa for periods in his childhood and was never abused. Robert generally expressed his shock at the allegations.

Sosa's account was something short of a blanket denial; although he asserted he was never inappropriately sexual with his nephews, he said he gave IP two testicular exams and showed him how to masturbate when his nephew complained of pain.[4] But he denied it was sexual, and also denied ever touching

---

[4] Sosa worked as a pediatric medical assistant, and it was not uncommon for him to attend to

22CV1022-JLS(BLM)

Patrick or LS in any way. Sosa's interview with the police, where he discussed these exams, was also played for the jury. There was scant evidence offered to suggest a motive for any of Sosa's nephews to fabricate the allegations. Sosa apparently removed Ivon as a beneficiary on his retirement accounts in 2017, and in closing argument the defense suggested the boys lied for "financial reasons." But even from the defense perspective it was unclear how Ivon, her sons, or Patrick would benefit financially from conspiring to frame Sosa for sexual abuse.

The jury convicted Sosa of counts 1 through 26 out of the 27 charged and found all the associated allegations true. He was only acquitted on the last count, which alleged a second incident as to LS.

Lodgment 1 at 2-8.

## **PROCEDURAL BACKGROUND**

Petitioner appealed the judgment of the Superior Court of San Diego County. Lodgment 2.  Petitioner argued that his due process rights were violated because the allegations he faced spanned a wide period of time, more than five years on some counts.  Id. at 13-20.  He further argued that the evidence supporting counts 1-14, 17-18, and 23 was generic and insufficient.  Id. at 21-41.  Respondent filed a brief in response [see Lodgment 3] and Petitioner filed a reply [see Lodgment 4].

On January 22, 2021, the California Court of Appeal affirmed the judgment of the superior court.  Lodgment 1.  The Court found that because Petitioner "did not take *any* steps to challenge the time ranges on due process grounds at any point after the preliminary hearing, [Petitioner's] attempt to revive this argument fail[ed]."   Id. at 11 (emphasis in original).  With respect to Petitioner's sufficiency of the evidence claims, the court found that (1) a reasonable jury could find that the incidents supporting counts 1-6, 8-11, and 13-14 were all separate incidents based on IP's testimony, (2) "a reasonable jury could find beyond a reasonable doubt that the abuse was accomplished by means of duress[,]" (3) a reasonable jury could find that IP testified that Petitioner touched his penis during the shower incident

medical complaints in the family.

1    and that duress need not be demonstrated for each individual count, and (4) any reasonable

2    jury could conclude beyond a reasonable doubt that the instances described included

3    penetration past the buttocks.  Id. at 13-23.

4        Petitioner filed a Petition for Review in the California Supreme Court arguing that review

5    should be granted to (1) "limit the current unbridled infringement of Defendant's due process

6    right, which this Court so carefully balanced in deciding Jones[,]" (2) transfer the matter back

7    to the court of appeal which did not reach the merits of Petitioner's challenge to the broad

8    range of date, and (3) "harmonize disparities among lower courts when applying the specificity

9    requirements mandated by Jones in cases where generic testimony is used" to convict a

10   defendant.  Lodgment 5.  On April 14, 2021, the California Supreme Court summarily denied

11   Petitioner's petition for review.  Lodgment 6.

12                          **STANDARD OF REVIEW**

13       Title 28 of the United States Code, section 2254(a), sets forth the following scope of

14   review for federal habeas corpus claims:

15           The Supreme Court, a Justice thereof, a circuit judge, or a district court shall
16           entertain an application for a writ of habeas corpus on behalf of a person in
             custody pursuant to the judgment of a State court only on the ground that he is
17           in custody in violation of the Constitution or laws or treaties of the United States.

18   28 U.S.C. § 2254(a).

19       The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty

20   Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214.  Under 28 U.S.C § 2254(d), as

21   amended by AEDPA:

22           (d) An application for a writ of habeas corpus on behalf of a person in custody
23           pursuant to the judgment of a State court shall not be granted with respect to
             any claim that was adjudicated on the merits in State court proceedings unless
24           the adjudication of the claim—

25           (1) resulted in a decision that was contrary to, or involved an unreasonable
             application of, clearly established Federal law, as determined by the Supreme
26           Court of the United States; or

27           (2) resulted in a decision that was based on an unreasonable determination of
28           the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In making this determination, a court may consider a lower court's analysis.  Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision).  Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely."  Harrington v. Richter, 562 U.S. 86, 99-100 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle [from the Supreme Court's decisions] but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413).  "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must be objectively unreasonable."  Id. at 75-76 (citations and internal quotation marks omitted).  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]."  Harrington, 562 U.S. at 102.  In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

1    Finally, habeas relief also is available if the state court's adjudication of a claim "resulted
2    in a decision that was based on an unreasonable determination of the facts in light of the
3    evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); Wood v. Allen,
4    558 U.S. 290, 293 (2010).  A state court's decision will not be overturned on factual grounds
5    unless this Court finds that the state court's factual determinations were objectively
6    unreasonable in light of the evidence presented in state court.  See Miller–El, 537 U.S. at 340;
7    see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds
8    reviewing the record might disagree" does not render a decision objectively unreasonable).
9    This Court will presume that the state court's factual findings are correct, and Petitioner may
10   overcome that presumption only by clear and convincing evidence.   See 28 U.S.C. §
11   2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007).

12                                          **DISCUSSION**

13   Petitioner raises three claims of error in his Petition.  Pet.  First, Petitioner argues that
14   his due process rights were violated when the state court permitted the prosecution "to allege
15   wide-ranging time periods, of more than five years for some counts, during which the offenses
16   may have occurred." Id. at 7-9.  Second, Petitioner argues that the application of Jackson and
17   Winship to the facts of the case by the state court was unreasonable and violated his rights.
18   Id. at 9-17.  This resulted in the convictions for counts 1-6, 8-11, and 13-14 being based on
19   generic  testimonial evidence and a lack of sufficient evidence for counts 7, 12, 17, 18, and 23.
20   Id. at 10. Finally, Petitioner argues that the cumulative effect of the errors violated his due
21   process rights.  Id. at 17.

22   Respondent contends that Petitioner procedurally defaulted his first claim in state court
23   by failing to object or otherwise challenge the information.  Ans. at 15-17.  Respondent further
24   contends that Petitioner procedurally defaulted on a portion of his sufficiency of the evidence
25   claims by failing to raise them in his petition for review and that regardless, the California
26   Court of Appeal reasonably rejected the claims on the merits.   Id. at 17-19.   Finally,
27   Respondent contends that Petitioner failed to exhaust his third claim and that it is meritless.
28   Id. at 29.

22CV1022-JLS(BLM)

## A.    **Procedural Default Regarding the Broad Time Periods**

Respondent argues that Petitioner's due process claim as to the overly broad time periods alleged in the charges is procedurally defaulted because he failed "to object to or otherwise challenge the information."  Ans. at 12-16.  Petitioner contends that "he did not forfeit his due process claim, nor is the claim now procedurally defaulted" and that his due process claim should be heard even if the state court procedural rules were violated.  Trav. at 2-3; see also Pet. at 8.  Petitioner further replies that his trial counsel raised this objection at trial so opposing counsel was aware of the issue, and that the timing of the objection – during the preliminary hearing instead of after the hearing – should not procedurally bar Petitioner from having the merits of his claims considered.  Id. at 3.  Petitioner also contends that even if his trial counsel failed to object, the trial court ruled on the issue so it has been preserved for appeal.  Pet. at 8.

Procedural default is an affirmative defense and Respondent must first "adequately [plead] the existence of an independent and adequate state procedural ground ...." Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003).  In order to place the defense at issue, Petitioner must then "assert [ ] specific factual allegations that demonstrate the inadequacy of the state procedure ...." Id.  The "ultimate burden" of proving procedural default, however, belongs to the state. Id. If the state meets its burden under Bennett, federal review of the claim is foreclosed unless Petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722 (1991).

A state procedural rule is "independent" if the state law basis for the decision is not interwoven with federal law. Michigan v. Long, 463 U.S. 1032 (1983); Harris v. Reed, 489 U.S. 255 (1989). A ground is "interwoven" with federal law if the state has made application of the procedural bar dependent on an antecedent ruling on federal law such as the determination of whether federal constitutional error has been committed. See Ake v. Oklahoma, 470 U.S. 68, 75 (1985). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly

established and regularly followed.'"  Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 61 (2009)).

A federal habeas court may still reach the merits of a procedurally defaulted claim if the petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or if he can demonstrate that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claims.  Coleman, 501 U.S. at 750.  "'Cause' for a procedural default exists where 'something external to the petitioner, something that cannot fairly be attributed to him impeded his efforts to comply with the State's procedural rule.'"  Sanai v. Villanueva, 2021 WL 6496783, at *4 (C.D. Cal., Nov. 15, 2021)  (quoting Maples v. Thomas, 565 U.S. 266, 280 (2012)).  A showing of prejudice, requires Petitioner to establish that the error at trial "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Id. (quoting Nguyen v. Curry, 736 F.3d 1287, 1292 (9th Cir. 2013)).

The last court to review Petitioner's claims was the California Supreme Court, which issued a one-sentence denial of the petition.  Lodgment 6 ("The petition for review is denied").  As a result, the Court must "look through" the decision to the appellate court's reasoning.  Ylst, 501 U.S. at 803-04  (authorizing a reviewing court to look through to the last reasoned state court decision).

The California Court of Appeal denied Petitioner's due process claim without ruling on the merits of the claim because it concluded that Petitioner forfeited the claim.  Lodgment 1 at 10.  The Court stated that:

1.  Due Process

The defendant's first contention concerns the broad time periods associated with his convictions. He asserts these date ranges—some of which exceed five years—denied him due process because they prevented him from mounting an effective defense. The crux of Sosa's argument is that because there is no authority expressly approving such long time periods, they must be constitutionally impermissible.

We first observe that the primary authority on this point, *People v. Jones* (1990) 51 Cal.3d 294 (*Jones*), suggests a contrary conclusion. The Jones court

11

considered the tension between due process and the often generic nature of sexual abuse allegations from children, and determined that in cases where the defendant either lives with or has "continuous access" to the child, generic allegations "by no means deprive the defendant of a reasonable opportunity to defend." (*Id.* at pp. 299, 320.) This is largely because alibi and  mistaken identity defenses can rarely be employed by defendants who have ongoing access to and a relationship with a child-victim. In such cases, denying the abuse and challenging the child's credibility is usually the only feasible course. (*Id.* at p. 320.) Sosa attempts to distinguish his case from Jones because he did not live with IP and LS during the entire period in which the crimes occurred. But in making this argument, he ignores his routine and continued access to the children. He lived just down the street, and the witnesses offered a general consensus that IP and LS visited Sosa's residence frequently after they moved out. Sosa thus had continuous access to the children throughout and, accordingly, the rationale in *Jones* applies to all of his convictions—not merely those from the period where the boys lived with him.

The defendant takes further issue with any application of *Jones* that would broaden it beyond the two-month time periods it considered. (*Jones, supra,* 51 Cal.3d at p. 303.) Subsequent cases indicate some expansion is permissible but provide little guidance on the upper limits. (*See People v. Gear* (1993) 19 Cal.App.4th 86, 95 [applying *Jones* where the abuse occurred over several months]; *Brodit v. Cambra* (9th Cir. 2003) 350 F.3d 985, 989 [approving the appellate court's application of *Jones* where charged date ranges spanned more than one year].) However, we need not reach the more difficult question of whether a six-year period pushes *Jones's* due process analysis past its parameters because we conclude Sosa forfeited this claim.

According to Sosa, he raised a due process concern about the length of the charging periods at the beginning of the preliminary hearing. Prior to IP's testimony, defense counsel did lodge some concerns regarding the complaint, noting that although she had no problem with the prosecutor charging date ranges in general, she could not easily determine which conduct aligned with which dates—a problem that was magnified by the poor audio quality in IP's forensic interview. The court discussed these challenges with counsel and acknowledged the due process implications. It also commented that more changes might be merited after they heard IP's testimony. When the hearing concluded, the court allowed the prosecution to amend the timeframes in the complaint consistent with IP's descriptions and bound over on all the counts. Sosa was arraigned on an information filed two weeks later.[5]

But even if we liberally construe defense counsel's early comments as

---

[5] The People filed an amended information at the time of trial that abandoned a handful of the counts.

12

challenging the length of the date ranges, the objection should have been pursued after the pleading changes that followed the preliminary hearing. Given the number of incidents and the problem with the forensic interview, both the prosecution and the defense lacked clarity as to the precise nature of IP's allegations before the hearing. It was only afterward that the People were able to ensure that the charging allegations in the information would be consistent with IP's anticipated trial testimony such that Sosa could fully understand the nature of the charges. It was at this point that Sosa should have alerted the trial court if he truly believed the date ranges specified in the information precluded him from mounting a defense.

Yet there were no objections or even concerns raised on these grounds either at the conclusion of the preliminary hearing or in the intervening period of about a year before the trial began. And procedural devices were available for just this purpose. Sosa could have demurred to the information (§ 1004) or filed a motion to set it aside (§ 995). (See, e.g., *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1022; *see also People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 523.) Because he did not take any steps to challenge the broad time ranges on due process grounds at any point after the preliminary hearing, Sosa's attempt to revive this argument on appeal fails. (*See People v. Riggs* (2008) 44 Cal.4th 248, 292 [to preserve a due process claim, defendants must properly raise it in the trial court].)

Id. at 9-11.

Respondent has satisfied his burden of adequately pleading the existence of an independent and adequate state procedural ground for the affirmative defense of procedural default for Petitioner's failure to object to the length of the time periods alleged in the charges in the information or amended information.  Respondent notes that the Court of Appeal found that Petitioner "forfeited his due process claims by failing to object or otherwise challenge the broad time ranges in the information."  Ans. at 16.  "The Ninth Circuit has repeatedly held that California's contemporaneous objection rule, which deems an objection waived if not raised in a timely fashion, is an adequate and independent state ground for dismissal."  Rowland v. Davy, 2020 WL 1216780, at *7 (C.D. Cal., Jan. 30, 2020) (citing Howard v. Campbell, 305 Fed. Appx. 442, 444 (9th Cir. 2008); Paulino v. Castro, 371 F.3d 1083, 1093 (9th Cir. 2004); and Cal. Evid. Code § 353.  Here, the court of appeal determined that Petitioner's trial counsel objected to the time periods alleged in the complaint but failed to object to the time periods alleged in the information (or amended information) which were based on I.P.'s testimony

13

during the preliminary hearing.  Lodgment 1 at 9-11.  Because the Court of Appeal clearly determined that Petitioner's trial counsel failed to object to the length of the time periods alleged in the information, Petitioner's claims are procedurally barred unless he rebuts the evidence.  Coleman, 501 U.S. at 750.  Petitioner fails to do so as he has not demonstrated cause for his failure to object and prejudice arising from the default or that a failure to consider his claims will result in a fundamental miscarriage of justice.  Petitioner instead asks the Court to ignore the lack of "perfect[] compl[iance] with the procedural rules in state court [and] still hear his due process claim."  Trav. at 2.  The Court declines to do so.

Even if the state court incorrectly imposed a procedural bar in this instance, which the Court does not believe is true, this Court does not have the ability to ignore the state court decision.  See Martinez v. Ryan, 926 F.3d 1215, 1224 (9th Cir. 2019) (rejecting petitioner's argument that the Post-Conviction Review Court misinterpreted the rule and improperly imposed a procedural default because it lacked jurisdiction to address that contention) (citing Poland v. Stewart, 169 F.3d 573, 584 (9th Cir. 1999) ("Federal habeas courts lack jurisdiction ... to review state court applications of state procedural rules."); accord Johnson v. Foster, 786 F.3d 501, 508 (7th Cir. 2015) ( "[A] federal habeas court is not the proper body to adjudicate whether a state court correctly interpreted its own procedural rules, even if they are the basis for a procedural default.")).  Accordingly, Petitioner's due process claim is procedurally barred and the Court **RECOMMENDS** the Petition be **DENIED** on this basis.

**B.    Sufficiency of the Evidence**

Petitioner argues that his convictions for counts 1-6, 8-11, and 13-14 were based on generic testimonial evidence that was not sufficient to prove the essential elements of the charges or prove the charges beyond a reasonable doubt.  Id. at 10.   Petitioner also argues that there was insufficient evidence supporting his convictions for counts 7, 12, 17, 18, and 23.  Id.

Respondent contends that Petitioner failed to exhaust his challenges to counts 7, 12, 17, 18 and 23 and therefore they are procedurally defaulted.  Ans. at 17-18.  Respondent also asserts that the state court reasonably rejected all of Petitioner's sufficiency of the evidence

claims.  Id.

    1.   Counts 1-6, 8-11, and 13-14

The essence of Petitioner's argument as to counts 1-6, 8-11, and 13-14 is that the charged time periods were too lengthy and I.P.'s testimony was too general to support the jury's required finding that each charged crime was based upon different sexual activity.  Pet. at 10-13.  Petitioner also argues that I.P.'s generic testimony does not satisfy the requirements of Jones, 51 Cal.3d at 314, including identifying the number of sexual acts committed within a specific time frame.  Id.

The clearly established federal law regarding sufficiency of the evidence claims in the criminal context is set forth in Jackson v. Virginia, 443 U.S. 307 (1979).  Jackson claims face a high bar in federal habeas proceedings.  Coleman v. Johnson, 566 U.S. 650, 651 (2012).  In Jackson, the Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  Jackson, 443 U.S. at 324.  In making this determination, habeas courts must respect "the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict."  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). "Circumstantial evidence alone can be sufficient to demonstrate a defendant's guilt." United States v. Cordova Baraias, 360 F.3d 1037, 1041 (9th Cir. 2004) (citing United States v. Reyes—Alvarado, 963 F.2d 1184, 1188 (9th Cir. 1992)) ("[C]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.").  "Although it might have been possible to draw a different inference from the evidence, [a federal habeas court is] required to resolve that conflict in favor of the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1114–15 (9th Cir. 2011); see also Coleman, 566 U.S. at 651 (stating that "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was

'objectively unreasonable.'") (quoting <u>Cavazos v. Smith</u>, 565 U.S. 1, (2011)); <u>see</u> <u>also</u> <u>Jackson</u>, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution"). Federal habeas courts also must analyze <u>Jackson</u> claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (quoting <u>Jackson</u>, 443 U.S. at 324 n. 16).

The Ninth Circuit has held that "[a]n additional layer of deference is added to this standard by 28 U.S.C. § 2254(d), which obliges [Petitioner] to demonstrate that the state court's adjudication entailed an unreasonable application of the quoted <u>Jackson</u> standard." <u>Briceno v. Scribner</u>, 555 F.3d 1069, 1078 (9th Cir. 2009) (citing <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005) ).  In <u>Juan H.</u>, the Ninth Circuit first reviewed the standard of review applied by the state appellate court to a sufficiency of the evidence claim, and found that although the state court did not cite to the relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court decision contradicts' Supreme Court precedent." <u>Juan H.</u>, 408 F.3d at 1274 n. 12, quoting <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2003).  Accordingly, it falls to this Court to determine whether the state appellate court opinion here "reflected an unreasonable application of <u>Jackson</u> ... to the facts of this case." <u>Id.</u> at 1275.

As an initial matter, it is apparent from the appellate court's citation to <u>People v. Johnson</u>, 26 Cal.3d. 557 (1980), that the state court applied the <u>Jackson</u> standard in reviewing Petitioner's sufficiency of the evidence claim.[6]  The question, then, is whether it did so reasonably. <u>See</u> <u>Briceno</u>, 555 F.3d at 1078; <u>Juan H.</u>, 408 F.3d at 1274.

The last reasoned state court decision on this issue came from the California Court of

---

[6] The standard set forth in <u>Johnson</u> mirrors the standard set forth in <u>Jackson</u>. <u>Johnson</u>, 26 Cal.3d. at 576-578.

Appeal, which rejected Petitioner's sufficiency of the evidence claims.  Lodgment 1 at 11-16. In reaching this decision, the court addressed the specific arguments raised by Petitioner in the instant petition and concluded that a reasonable jury could find, based on I.P.'s testimony, that all of the charged crimes were based on different sexual events.  Id.

With regard to the crimes that were not based on specific events or locations, the court explained that there were two time periods[7]: "January 1, 2011 to July 7, 2013, when IP lived with Sosa" and "July 8, 2013 to April 30, 2016, when IP lived in a nearby apartment" and that "[t]he counts based on generic testimony were often charged as first and last times for a particular type of conduct during a certain period."  Id. at 12.  The Court explained

> Counts 1 through 7 all took place during the first period. Counts 1 through 4 (based on two incidents each charged in the alternative under two different statutes) allege a first and last time that Sosa orally copulated IP. Counts 5 through 6 cover a first and last time where Sosa touched IP's penis with his hand. Count 7 is based on the specific shower incident where Sosa came into the bathroom and touched IP's penis.
>
> Counts 8 through 11, and 13 through 16 all took place during the second period. Counts 8 through 11 are counterparts to 1 through 4, concerning the first and last times that Sosa orally copulated IP (again charged in the alternative). Counts 13 and 14 are the first and last time Sosa touched IP's penis with his hand. Counts 15 and 16 are based on specific incidents and, respectively, they concern Sosa orally copulating IP in the garage and touching IP's penis in IH's room.

Id. Viewing I.P.'s testimony in this framework, the court found sufficient evidence supporting each charged crime and separating them from each other.  Id. at 13-16.  The court explained

IP's general testimony specified that Sosa abused him "whenever we would be

---

[7] The appellate court identified three time periods but the third time period is not relevant to this argument.  Lodgment 1 at 12-13.  The third time period "runs from May 1, 2016 to July 26, 2016, the summer immediately before IP moved to Los Angeles."  Id. at 12.  Counts 12, and 21 through 24 occurred the night before the fair and were included in this time period. Id. at 12-13.  Count 12 is charged in the amended information as occurring between July 8, 2013 and July 26, 2016, which overlaps with time period two, but I.P. clarified during his testimony that the conduct at issue in count 12 occurred the night before the fair.  Id. 13, n.7; Lodgment 9, Vol. 1, at 50.

alone." It happened in Sosa's room, where IP recalled Sosa would sometimes lock the door, and then "tell me that he won't hurt me, that it's going to be okay[,] [and then] take off my clothes and touch me in places I wouldn't like." When he elaborated more on what generally occurred, IP explained that Sosa would orally copulate him "the most," and that this conduct happened both while they lived together and afterward. He also answered affirmatively when asked if Sosa orally copulated him "often," and if there were "multiple" incidents of this kind that spanned the first and second periods. Linking the copulation with manual touching, IP explained that Sosa usually touched his penis with his hand at some point during the episodes of oral copulation. He affirmed that Sosa touched him this way more than once both when he lived with Sosa and after his family moved out.

Taken as a whole, IP's testimony indicates Sosa generally abused him in the master bedroom and that he touched IP's penis with his hand and orally copulated him at least twice in both the first and second periods. There is also a strong suggestion that this occurred more than twice. Although phrases like "whenever we would be alone" are admittedly ambiguous regarding frequency, a strong inference can be drawn that this abuse was a regular fixture of IP's childhood.

In terms of distinguishing the specific incidents IP recalled from the less memorable first and last times, there were significant factors setting the specific incidents apart that could lead a reasonable jury to conclude they were additional abuse events.

Id. at 13-14.  The court provided further explanation regarding the sexual acts that occurred in the shower (count 7), in I.H.'s room (count 16), in the garage (count 15), and the night before the fair (count 12).  Id. at 14-15.

A review of the record, including I.P.'s testimony, establishes there is sufficient evidence supporting the appellate court's conclusion.  I.P. testified to generally suffering sexual abuse by Petitioner from 2011-2016.  Lodgment 1 at 12; Lodgment 7 at 91-94 (I.P. testifying that he did not remember every time he was inappropriately touched in Petitioner's bedroom but that it happened many times and that Petitioner used his hands and mouth to touch I.P.'s penis and tried to put his penis in I.P.'s butt), 98 (I.P. testifying that Petitioner attempted to put I.P.'s penis in his butt "more than one time"), 110 (I.P. testifying that Petitioner began abusing him when he was in middle school and continued even after he moved out of Petitioner's house) 114-115 (I.P. testifying that Petitioner touched him for the first time when he was in

middle school and that the last time was a couple of years before the trial), Lodgment 8, Vol. 1 (ECF No. 5-9) at 227-228 (I.P. testifying that Petitioner applied lotion to I.P.'s penis more than once), 230 (I.P. testifying that the abuse was throughout middle school).

The crimes charged in counts 1-6 occurred between January 1, 2011 and July 7, 2013 while I.P. was residing in Petitioner's home.  Lodgment 9, Vol. 1, at 46-48.  Counts 1 and 3 charge the first act of oral copulation during that time period and Counts 2 and 4 charge the last.  Id.  Counts 5 and 6 charge the first and last acts of touching I.P's penis during that time period. Id. I.P. testified that during this time period he was sexually abused by Petitioner on numerous occasions.  Lodgment 7 at 75 (Petitioner touched I.P. in the shower "more than one time"), Lodgment 8, Vol 1 (ECF No. 5-9) at 174 (touching happened more than one time while living with Petitioner), at 213 (the touching happened a lot of times in the shower). I.P.'s testimony established that Petitioner touched I.P.'s penis on more than two occasions and orally copulated I.P. on more than two occasions. Lodgment 7 at 69 (I.P. responding that Petitioner would touch him inappropriately while he was living with Petitioner), 71 (I.P. responding "yes" when asked if there were things that Petitioner did that bothered him while he lived with Petitioner before describing inappropriate, sexual touching), and Lodgment 8, Vol. 1 (ECF No. 5-9) at, at 274 (responding yes when asked if Petitioner touched his hand to I.P.'s penis more than one time while I.P. was living with him), at 273 (responding yes when asked if there were multiple times Petitioner put his mouth on I.P.'s penis while I.P. was living with Petitioner).

In addition to testifying about the abuse that occurred repeatedly during the time he lived with Petitioner, I.P. testified about a specific instance of abuse that took place in Petitioner's shower and formed the basis of count 7.  Lodgments 7 and 8.  I.P. testified that he was in the shower when Petitioner came in the bathroom, opened the shower door, grabbed I.P.'s penis with his hand, and moved his hand in a jerking motion.  Lodgment 7 at 72-73, Lodgment 8, Vol. 1 at 211-212.  As I.P. attempted to scoot away, Petitioner told I.P. that he loved him and was not going to hurt him.  Lodgment 7 at 74, Lodgment 8, Vol. 1 at 213-213.  I.P. testified that this occurred towards the end of the time when he was living with

1  Petitioner.  Lodgment 7 at 74. As such, there was ample evidence supporting the jury's verdict
2  on counts 1-7.

3         The crimes charged in Counts 8-11 and 13-14 occurred between July 8, 2013 and April
4  30, 2016, while I.P. was living in an apartment close to Petitioner's home.  Lodgment 9, Vol. 1
5  at 49-51.  Counts 8 and 10 charge the first act of oral copulation during that time period and
6  Counts 9 and 11 charge the last.  Id.  Counts 13 and 14 charge the first and last acts of
7  Petitioner touching I.P's penis during that time period.   Id.   Again, I.P. testified about
8  numerous acts of sexual abuse that occurred during this time period.  Lodgment 7 at 69
9  (testifying that Petitioner would touch him inappropriately "some of those times that we would
10 go and visit" after having moved out).  I.P.'s testimony established that Petitioner touched
11 I.P.'s penis on more than two occasions and orally copulated I.P. on more than two occasions.
12 Lodgment 8, Vol. 1 (ECF No. 5-9) at 271 (responding "yes" when asked if oral copulation with
13 Petitioner happened "more than one time after [I.P.] moved out"), at 273 (responding yes
14 when asked if there were multiple times Petitioner put his mouth on I.P.'s penis after I.P.
15 moved out), at 274 (responding yes when asked if Petitioner touched his hand to I.P.'s penis
16 more than time after I.P. had moved out).

17        In addition to testifying about the general abuse occurring during this period, I.P.
18 testified about two specific instances of abuse that occurred during the time he lived in an
19 apartment near Petitioner's home. The first incident occurred in Petitioner's garage and formed
20 the basis of count 15.  Lodgment 9, Vol. 1, at 51. I.P. testified that he was walking to
21 Petitioner's house to get a Halloween costume from Petitioner's garage and Petitioner passed
22 him on the road on his way home from work and picked him up.  Lodgment 7 at 105.  When
23 they arrived, they went to the garage and Petitioner got the costumes and as I.P. was looking
24 at them, Petitioner got on his knees, pulled down I.P.'s pants, and put his mouth on I.P.'s
25 penis.  Lodgment 7 at 105.  Lodgment 8, Vol. 1 at 213.  Petitioner told I.P. that it was "okay"
26 and it continued until Petitioner heard I.P.'s mother pull her car into the driveway.  Lodgment
27 8, Vol. 1 at 216.  I.P. testified that this was the only time that Petitioner touched him sexually
28 in the garage.  Id. at 218.

The second incident occurred in I.P.'s sister's room and formed the basis of count 16. Lodgment 9, Vol. 1 at 51-52. I.P. testified that one night after he had moved out of Petitioner's home, he was visiting and in his sister's room (I.P.'s sister lived with Petitioner at the time). Lodgment 7 at 101. I.P. testified that when his sister left to take a shower, Petitioner pulled down I.P.'s pants, held him down, and put his mouth on I.P.'s penis. Lodgment 7 at 101, Lodgment 8, Vol. 1 at 219-220. When I.P.'s sister briefly returned to the room for something she forgot, Petitioner quickly pulled I.P.'s pants back up and pretended to be tickling I.P. Lodgment 7 at 103, Lodgment 8, Vol 1 at 220. After his sister left for the second time, Petitioner again pulled I.P.'s pants down and put his mouth back on I.P.'s penis. Lodgment 7 at 104. I.P. testified that this was the only time Petitioner abused him in that room. Lodgment 7 at 105. As such, there was ample evidence supporting the jury's verdict on counts 8-16.

As summarized above, a careful review of the record establishes that Petitioner repeatedly sexual abused I.P. while I.P. lived with him (1/1/2011-7/7/2013) and while I.P. lived nearby (7/8/2013-4/30/2016). The record provides ample support for the jury's conclusion that during the first time period, Petitioner touched I.P.'s penis on at least two separate occasions in addition to the touching that occurred in the shower. The record also supports the conclusion that Petitioner orally copulated I.P. on at least two occasions while I.P. lived in Petitioner's home. The record further supports the jury's determination that Petitioner orally copulated I.P. while I.P. lived down the street and that he did so on at least two occasions in addition to the acts that occurred in the garage and in I.P.'s sister's room. Finally, the record establishes that Petitioner touched I.P.'s penis on at least two occasions while I.P. lived in the apartment near Petitioner's home. The Court further finds that the appellate court's decision that there were sufficient facts contained in I.P.'s generic testimony to establish the requisite separate sexual acts and to support the jury's conclusion that Petitioner was guilty of the crimes charged in counts 1-6, 8-11, and 13-14 was not an unreasonable application of the <u>Jackson</u> standard.

Petitioner next argues there was insufficient evidence under <u>Jones</u> to support the convictions in Counts 5, 6, 13, and 14 (illegal touching).  Pet. at 13.  Petitioner relies on <u>Jones</u> to argue that while generic testimony is permissible, the testimony must "describe the number of acts committed with sufficient certainty to support each of the counts."  <u>Id.</u>  In <u>People v. Jones</u>, 51 Cal. 3d. 294, the court stated

> [I]n determining the sufficiency of generic testimony, we must focus on factors other than the youth of the victim/witness. Does the victim's failure to specify precise date, time, place or circumstance render generic testimony insufficient? Clearly not. As many of the cases make clear, the particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction. [Citations.] [¶] The victim, of course, must describe the kind of act or acts committed with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe the general time period in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us'), to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction.

<u>Id.</u> at 315-316.

For the reasons set forth above, the Court finds that I.P.'s testimony satisfies the <u>Jones</u> specificity standard.  I.P.'s testimony clearly differentiated between oral copulation, touching of his penis, and anal penetration.  I.P.'s testimony also established a routine of sexual abuse that included at least two separate acts of oral copulation and penile touching during both the time he was living with Petitioner and during the time he was living nearby.  I.P.'s testimony also established that separate specific or notable sexual abuse acts occurred during the two time periods and that those notable or specific events were in addition to the two acts (first and last) of illegal touching and oral copulation.  Contrary to Petitioner's argument, the <u>Jones</u> rationale does not require the victim to identify a specific number of abuse acts or that the abuse occurred with a specific regularity; rather, it requires the victim to provide sufficient

information to establish the specific types of sexual abuse that occurred and the "general time period" during which the abuse occurred to "assure the crimes were committed within the applicable limitation period." Id. at 315-16.  I.P.'s testimony satisfied these requirements by describing the three types of abuse (oral copulation, touching, and anal penetration) and the two time periods (while living with Petitioner and while living near Petitioner). The victim also must "describe the number of acts committed with sufficient certainty to support [each count]." Id.  As discussed above, I.P.'s testimony satisfied this requirement by establishing that two of each type of sex act occurred during each of the identified time frames.  See Garner v. Cates, 2021 WL 1222776, at *24 (E.D. Cal., Apr. 1, 2021) (finding defendant's convictions in counts 3 through 6 for raping M.Ga. supported by substantial evidence where M.Ga., who "was reluctant to describe the nature of the sexual assaults, [] ultimately testified that defendant had performed acts of digital penetration, oral copulation, and sexual intercourse against her, and that he raped her more than once and '[w]henever he got the chance'" with the first rape occurring when she was in middle school until she ran away between seventh and eighth grade); see also Blackburn v. Koenig, 2020 WL 7364658, at *12 (C.D. Cal., Nov. 18, 2020) (finding the Court of Appeal's finding was not an unreasonable application of federal law where it found Doe's testimony satisfied the Jones requirement by "testif[ying] to the kinds of sexual acts Petitioner committed—lewd acts and oral copulation; the number of times the acts occurred—approximately once a week; and the general time period in which the acts occurred—from the time Doe 2 was age seven or eight until she was age ten or eleven").

Petitioner's argument also fails because he has not demonstrated that his convictions for crimes based upon I.P.'s generic testimony resulted in a decision that was contrary to or an unreasonable application of clearly established federal law determined by the Supreme Court. Petitioner does not provide any authority from the United States Supreme Court supporting his position that generic testimony such as that provided by I.P. is insufficient to support a conviction for violations of Cal. Penal Code §§ 288, 288.7, and 269.  Given the lack of Supreme Court authority establishing clear law that is applicable to this case, the Court of Appeal's

decision cannot be contrary to or an unreasonable application of Supreme Court law. <u>See</u> <u>Vidal v. Paramo</u>, 2015 WL 4040617, at *8 (C.D. Cal., June 9, 2015).[8]

For all of these reasons, the Court **RECOMMENDS** that Petitioner's Petition be **DENIED** as to counts 1-6, 8-11 and 13-14.

2. <u>Counts 7, 12, 17, 18, and 23</u>

Petitioner presents specific arguments as to why there is insufficient evidence supporting each of these convictions. Pet. at 13-17.

a. <u>Exhaustion/Procedural Default</u>

Respondent initially argues that Petitioner's insufficiency of the evidence claim as to the specific evidence counts (counts 7, 12, 17, 18, and 23) is procedurally defaulted because Petitioner failed to present the claims to the California Supreme Court in his petition for review. Ans. at 17-19. Petitioner addresses the procedural default argument with respect to the broad time periods (discussed above) but does not address procedural default in relation

---

[8] Citing <u>Wright v. Van Patten</u>, 552 U.S. 120, 125–26 (2008); <u>Carey v. Musladin</u>, 549 U.S. 70, 76–77, 127 S. Ct. 649 (2006); <u>Gucciardo v. Knipp</u>, 2015 WL 403852, *8–*12 (E.D. Cal. Jan.28, 2015) (rejecting petitioner's claim that victim's generic testimony insufficient to support sexual abuse convictions; *Jones* and related California law regarding sufficiency of generic testimony not contrary to or unreasonable application of clearly established law); <u>Nuno v. Davey</u>, 2014 WL 3725332, *11–*13 (N.D. Cal. July 21, 2014) ("Given [California] Supreme Court's precedent that generic testimony is sufficient to support a conviction for sexual offenses, it cannot be said that the state appellate court's rejection of Petitioner's due process claim was contrary to, or involved an unreasonable application of clearly Supreme Court law."); <u>Morales v. Ocegueda</u>, 2013 WL 6050476, *8–*9 (C.D. Cal. Nov.13, 2013) (rejecting petitioner's claim that victim's generic testimony was insufficient to support child molestation convictions); <u>Castillo v. Long</u>, 2013 WL 1182943, *20 (C.D. Cal., Jan.9, 2013) (rejecting claim that generic testimony was insufficient to support convictions for lewd acts upon a child), adopted by, 2013 WL 1182951 (C.D. Cal., Mar.21, 2013); <u>Aburto v. Clark</u>, 2010 WL 4269537, *8 (C.D. Cal., Aug.9, 2010) (same), adopted by 2010 WL 4281693 (C.D. Cal., Oct.25, 2010); <u>Love v. Lea</u>, 2010 WL 3058979, at *5 n. 4 (N.D. Cal., Aug.2, 2010) (rejecting petitioner's claim that generic testimony could not support his sexual assault convictions); <u>Doughtie v. Scribner</u>, 2007 WL 2669922, at *5–*6 (E.D. Cal., Sept.7, 2007) (concluding that victim's "generic testimony" did not violate petitioner's due process rights), adopted by 2007 WL 3231653 (E.D. Cal., Nov.1, 2007).

1   to the specific testimony counts.  Trav.

2       Habeas petitioners who wish to challenge their state court conviction must first exhaust

3   state judicial remedies. 28 U.S.C. § 2254(b), (c). Exhausting state judicial remedies requires a

4   California state prisoner to present the California Supreme Court with a fair opportunity to rule

5   on the merits of every issue raised in his or her federal habeas petition.  Id.  Failure to

6   properly exhaust a claim prevents a reviewing court from granting relief on the claim.  See 28

7   U.S.C.A. §2254(b)(1)(A); see also Rose v. Lundy, 455 U.S. 509, 522 (1982).  If a prisoner fails

8   to properly exhaust a claim, a reviewing court may not grant habeas relief on the merits but

9   may deny it when it does not present a colorable claim.  See 28 U.S.C. § 2254(b)(2) ("An

10  application for a writ of habeas corpus may be denied on the merits, notwithstanding the

11  failure of the applicant to exhaust the remedies available in the courts of the state.").

12      A claim may be considered technically exhausted when a petitioner fails to present a

13  claim in the state court but the petitioner is no longer able to do so because "the court to

14  which the petitioner would be required to present his claims in order to meet the exhaustion

15  requirement would now find the claims procedurally barred."  Coleman, 501 U.S. at 735 n.1.

16  Technically exhausted claims are procedurally defaulted in federal court. See Jones v.

17  Montgomery, 2021 WL 3726740, at *7 (S.D. Cal., Aug. 23, 2021) (citing O'Sullivan v. Boerckel,

18  526 U.S. 838, 848 (1999); Cooper v. Neven, 641 F.3d 322, 328 (9th Cir. 2011) (recognizing

19  "procedural default encompasses claims that were not presented in state court and would now

20  be barred by state procedural rules from being presented at all," including "any unexhausted

21  claims that would be considered untimely if [petitioner] attempted to exhaust them now," and

22  noting that type of claim is "technically exhausted but procedurally defaulted").  A federal

23  habeas court may reach the merits of a procedurally defaulted claim if the petitioner can

24  demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from

25  the default, or if he can demonstrate that a fundamental miscarriage of justice would result

26  from the Court not reaching the merits of the defaulted claims.  Coleman, 501 U.S. at 750.

27  "[A] reviewing court may choose to instead address the merits of a claim when it proves

28  simpler than addressing procedural matters and makes no difference to the outcome."  See

1   Morrison v. Allison, 2021 WL 4504637, at *9 (S.D. Cal., Oct. 1, 2021) (citing Franklin v.
2   Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently
3   more complex than the merits issues presented by the appeal, so it may well make sense in
4   some instances to proceed to the merits if the result will be the same.") (citing Lambrix v.
5   Singletary, 520 U.S. 518, 525 (1997))

6          Here, Petitioner filed an opening brief in the California Court of Appeal asserting his
7   sufficiency of the evidence argument as to the crimes based on generic testimony (counts 1-6,
8   8-11, and 13-14) and as to the crimes based upon specific testimony (counts 7, 12, 17, 18,
9   and 23). Lodgment 2. Petitioner's petition for review in the California Supreme Court only
10  challenged the sufficiency of the evidence with respect to the generic testimony counts.
11  Lodgment 5.  As a result, it appears that Petitioner has not properly exhausted his sufficiency
12  of the evidence claims as to counts 7, 12, 17, 18, and 23.  Because Petitioner did not address
13  the exhaustion and procedural default arguments as to these claims and because the claims
14  clearly do not present "even a colorable federal claim," the Court finds it appropriate to
15  exercise its discretion to consider and deny Petitioner's claims on the merits. See Jones, 2021
16  WL 3726740, at *7 ("[e]ven to the extent Claim 9 remains unexhausted and while habeas
17  relief may not be granted on an unexhausted claim, the Court may also exercise discretion to
18  deny an unexhausted claim on the merits") (citing 28 U.S.C. § 2254(b)(2) ("An application for
19  a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the
20  applicant to exhaust the remedies available in the courts of the State."); Cassett v. Stewart,
21  406 F.3d 614, 624 (9th Cir. 2005) ("[A] federal court may deny an unexhausted petition on
22  the merits only when it is perfectly clear that the applicant does not raise even a colorable
23  federal claim.")); Morrison v. Allison, 2021 WL 4504637, at *9 (finding addressing the issue on
24  the merits to be more efficient where "Petitioner's defaulted ineffective assistance of counsel
25  contentions raised in Claims One and Two fail under even a de novo review and Petitioner is
26  not entitled to habeas relief regardless of the outcome of a procedural default analysis"); see
27  also Jones, 2021 WL 3726740, at *7 (same).

28  ///

1

      b. <u>Counts 7 and 12 - Duress</u>

2       Petitioner argues there is insufficient evidence to support the conclusion that Petitioner

3 used force, violence, duress, menace, or fear to commit the crimes charged in  counts 7 and

4 12.  Pet. at 13-14.  Defendant contends that the Court of Appeal reasonably determined there

5 was sufficient evidence to support the duress requirements of counts 7 and 12.  Ans. at 25.

6       The California Court of Appeal, the last state court to issue a reasoned decision on this

7 claim, rejected Petitioner's argument on habeas review.  Lodgment 1.  The appellate court

8 explained as to count 7:

9

    b. Evidence of force or duress

    Next, Sosa asserts that IP's testimony was insufficient to support the element of
force needed to convict on counts 3 through 7, 10 through 11, and 13 through
14. All of these fall under section 288, subdivision (b)(1), which penalizes an
aggravated lewd act on a child under 14 by means of "force, violence, duress,
menace, or fear of immediate and unlawful bodily injury on the victim or another
person." Sosa correctly notes that IP testified he was never threatened, but he
glosses over duress—one of the enumerated possibilities in subdivision (b) and
the one that best fits this fact pattern.

    An outright threat is not required to sustain a conviction under subdivision (b). (§
288, subd. (b).) Duress is an independent aggravating factor apart from the
others listed. (*People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 (*Schulz*) ["
'Duress' would be redundant in the cited statutes if its meaning were no different
than 'force,' 'violence,' 'menace,' or 'fear of immediate and unlawful bodily
injury.' "]; *see also People v. Soto* (2011) 51 Cal.4th 229, 239 (*Soto*) [detailing
the legislative history of section 288, subdivision (b) and amendments to the list
of aggravators].) Even when "the victim testifies the defendant did not use force
or threats [that] does not preclude a finding of duress." (*People v. Thomas*
(2017) 15 Cal.App.5th 1063, 1072 (Thomas).) In this statutory context, duress is
defined as "'a direct or implied threat of force, violence, danger, hardship or
retribution'" that is enough to coerce a reasonable person to engage in, or
submit to, acts they would otherwise not have performed. (*People v. Leal* (2004)
33 Cal.4th 999, 1004.) Juries are instructed to "consider all the circumstances" in
evaluating duress, including the age of the child and the child's relationship with
the defendant. (CALCRIM No. 1111; *see also People v. Cochran* (2002) 103
Cal.App.4th 8, 16 (*Cochran*).) Consequently, we assess whether the evidence—
including the holistic "totality of the circumstances"—provided a basis for a
rational jury to conclude that IP was coerced into the lewd acts by an implied
threat of hardship, danger or retribution.

A review of the relevant case authority puts the facts of this case comfortably within the realm of duress. "When the victim is young and is molested by her father in the family home, duress will be present in all but the rarest cases." (*Thomas, supra*, 15 Cal.App.5th at pp. 1072☐1073.) Although Sosa was not IP's biological father, he was seen by many family members in this light. IP described his relationship with Sosa in these terms: "He was like a father to me. I just—I loved him very much. I trusted him." Nearly all the testifying family members repeated this characterization; Sosa was a father figure to many in the family, and IH noted that he took on this role for the boys in particular. They would camp together in the back yard, play video games, and he planned "special days" for them. Considering Sosa's fatherly role, IP's young age when the abuse began (likely eight or nine), and the fact that they lived together, there is no reason to distinguish this case from others that find duress when a father molests a child in the family home. (*See Cochran, supra*, 103 Cal.App.4th at p. 15 [duress supported when a nine-year-old victim seemingly went along with her father's abuse].)

Several other factors indicative of duress are also present here. IP was much smaller than Sosa, who weighed approximately 250 pounds. (*Schulz, supra*, 2 Cal.App.4th at p. 1005 [relative size of abuser and victim is a duress factor].) One obvious reason that size matters is the offender's ability to physically control the child, which happened here; IP explained that on several occasions he could not physically get away from Sosa, who held his arms down or held him down on the ground to accomplish the lewd acts. IP would try to push him off, but Sosa would not let him. In IP's words, "He was too big . . . . I wasn't strong enough to push him away from me." Although this might amount to no more than the force physically necessary to complete the assault—which would fall short of establishing force under subdivision (b)—it is nonetheless an additional indicator of duress. (*Soto, supra*, 51 Cal.4th at p. 242; *Thomas, supra*, 15 Cal.App.5th at p. 1072 [abuser "physically controlling the victim when the victim attempts to resist" supports duress].) Continuous abuse over time and assaults that "took place in an isolated room out of the presence of other adults" are yet more indicators of duress that were also present in this case. (*People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 238☐239 (*Kneip*).) These factors alone may be enough for a reasonable jury to find the lewd acts were committed by duress. (*See Mena v. Muniz* (C.D.Cal., Nov. 18, 2015, No. CV 15-2691-JGB (KS)) 2015 U.S. Dist.Lexis 171615, *15.) But the psychological manipulation and the power dynamics in the family provide even more significant evidence of duress.

Sosa groomed IP to accept the abuse, starting with touching and oral copulation and then introducing more varied sex acts over time. He used his "longstanding relationship of trust" (*Kneip, supra*, 219 Cal.App.3d at p. 238) to manipulate IP, telling the boy he loved him and would not hurt him. He even apologized when IP managed to leave the room—a tactic he piloted on Patrick. Indeed, Sosa retained Patrick's trust such that as an adult, he still gave Sosa the benefit of the doubt. The results of his grooming IP were even more severe. IP continued to

trust Sosa even during incidents of abuse. He testified that, although he did not want to engage in sex acts with Sosa, his uncle "made me think it was okay." As we have previously observed, "[t]he very nature of duress is psychological coercion." (*Cochran, supra*, 103 Cal.App.4th at p. 15.)

The uneven division of power in the family may have compounded Sosa's coercive influence on IP, and certainly demonstrates an implied threat of hardship. When the molestation started, IP's family was living with Sosa because Ivon had lost her job and was caring for a new baby. Although the nuances of this arrangement might have been best understood by the adults involved, children are capable of appreciating their parent's dependence on another person. And this dynamic was not lost on IP. In explaining why he stayed silent about the abuse, IP mentioned that Sosa helped his family a lot. He was also acutely aware of his mother's close relationship with Sosa. Ivon loved her uncle, depended on him, and looked up to him. Even after IP moved to Los Angeles and no longer lived with his mother, it was so difficult for him to confront her with the shattering news of Sosa's abuse that he asked Patrick to tell her instead. All of this evidence supports the conclusion that the family power dynamics, in which Sosa provided both financial and emotional stability, contributed to an implied threat of hardship if IP did not submit to the abuse.

Taken as a whole, the record tells the story of a young boy who was singled out and preyed on by a beloved uncle who supported his mother in multiple ways. Sometimes IP physically resisted the abuse—but it did not matter. His uncle would hold him down or grab his arms. This degree of force, while not overtly violent, sent a message that he needed to submit. And he did. He submitted out of necessity, but also out of love and trust, even though the abuse embarrassed him and made him uncomfortable.  He endured it for many years, initially protecting his family's relationships and stability while his mother got back on her feet; he then continued to do so when she relied on his abuser for childcare and small loans. It was not necessary for his uncle to hint that adverse consequences would follow if the boy told someone. He knew that his family could lose his uncle's support, which was a strong fiber in the social fabric that provided them with stability.

Given this broader context, a reasonable jury could find beyond a reasonable doubt that the abuse was accomplished by means of duress. Whether any other inferences could be drawn from the record is irrelevant. (*Marroquin v. Hernandez* (C.D.Cal., Jan. 24, 2013, No. CV 08-2658-CJC (JC)) 2013 U.S.Dist.Lexis 52659, *28, *46 [faced with a record that could support either a finding of duress or lack thereof, the reviewing court must respect the jury's inference].)

Lodgment 1 at 17-21. The court relied on the above analysis for its decision that there also was ample evidence supporting the force or duress element of count 12 and noted that

22CV1022-JLS(BLM)

[i]n challenging count 12, Sosa suggests this conviction requires an additional showing (beyond what is required for a section 288, subdivision (b)(1) offense) that the act was accomplished against the victim's will. (§ 269, subd. (a)(4); § 287, subd. (c)(2)(A).) This statutory factor is irrelevant in a child abuse case. The jury instruction, which was provided, explains this element as a lack of consent. (CALCRIM No. 1015.) It is well established that children cannot consent to sex acts with adults as a matter of law. (Soto, supra, 51 Cal.4th at p. 238.)

Lodgment 1 at 21 n.8.  Finally, the court noted "defendant's faulty premise that duress must be demonstrated for each count in isolation; if a jury were bound by that analytical approach, its ability to consider the holistic circumstances would be undermined. (*See Mendez v. Davey* (C.D.Cal., Aug. 18, 2017, No. EDCV-15-2496-PSG (JEM)) 2017 U.S.Dist.Lexis 156852, *25 ["California permits generic testimony in child molestation cases . . . and does not require the prosecution to specifically link the evidence of force to each act of sexual assault."].)" Id. at 22-23.

Count 7 charges a violation of Cal. Penal Code section 288(b)(1) which requires a person to commit an act described in subdivision (1) "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Count 12 charges a violation of Cal. Penal Code section 269(a)(4) which states that "[a]ny person who commits any of the following acts upon a child who is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child" and lists "[o]ral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 287 or former Section 288a." Cal. Penal Code section 287 discusses imprisonment for certain acts of oral copulation "by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim." California defines duress as "a direct or implied threat of force, violence, danger, hardship, or retribution sufficient to coerce a reasonable person of ordinary sensibilities to perform an act which otherwise would not have been performed or acquiesce in an act to which one otherwise would not have submitted." People v. Thomas, 2022 WL 906452, at *3 (Cal. Ct. App., Mar. 29, 2022) (citing People v. Garcia, 247 Cal.App.4th 1013, 1023 (2016))

Count 7 addressed Petitioner touching I.P.'s penis in the shower.  Pet. at 14; Lodgment

2 at 36; Lodgment 9, Vol. 1, at 48.   Count 12 addressed Petitioner's penis touching I.P.'s mouth the night before the fair. Lodgment 1 at 13; Lodgment 2 at 37-38; Lodgment 9, Vol. 1, at 50.   The record contains ample evidence supporting the appellate court's conclusion that the crimes were committed through the use of duress. I.P. testified that he loved Petitioner and that he considered Petitioner to be a father figure.  Lodgment 7 at 70, Lodgment 8, Vol. 1 at 172.  I.P. lived with Petitioner who had an active role in I.P.'s life doing things like picking him up from school, teaching him to cook and garden, and taking him to the park, camping, and work events at the fair or zoo.   Lodgment 7 at 70-71, 76, 1134, Lodgment 8, Vol. 1 at 172-173.   I.P. also testified that he knew his mother loved Petitioner and viewed him as a father figure and that her relationship with Petitioner made it more difficult for him to tell her what Petitioner was doing to him.  Lodgment 7 at 112.  I.P. testified that the lewd acts began when he was in middle school and when the lewd acts were occurring and he protested, Petitioner would make comments like "I won't hurt you," "calm down," and "I love you." Lodgment 7 at 74, 81, 99, Lodgment 8, Vol. 1 at 179.    Petitioner would also lock the door. Lodgment 7 at 78.  At times, I.P. would try to push Petitioner away but was often held down by Petitioner's arms or unable to get away because Petitioner was sitting on him.  Lodgment 7 at 81, 99, 104, Lodgment 8, Vol. 1 at 179, 227.  When I.P. was not being held down and tried to walk away, Petitioner would pull him back and hold him down.   Lodgment 7 at 100. Petitioner would try to get I.P. to touch Petitioner's penis with his hand, even after I.P. pulled his hand away, and try to force I.P.'s head to Petitioner's penis.  Id. at 94-96.  I.P. testified that he did not tell anyone when all of this happened because he was scared and embarrassed.  Id. at 108.

Petitioner generally testified that he was a loving, caring, and supporting father figure to I.P.  Lodgment 8, Vol. 2 (ECF No. 5-10) at 284.  He also testified that he allowed I.P. and his mother and siblings to move in with him because I.P.'s mother had lost her job, was unable to renew her lease, and was having difficulty with the abusive father of her youngest baby.  Id. at 301.  Petitioner testified that he frequently lent money to I.P.'s mother.  Id. at 302-303.  With regard to the acts alleged, Petitioner testified that he had conducted an

1  examination of IP.'s testicles after I.P. complained of pain and that he taught I.P. how to
2  masturbate, but did not engage in any inappropriate sexual activity with I.P.  Id. at 299-301,
3  308, 317-320.

4      Other than stating that the evidence is insufficient to establish duress, Petitioner does
5  not provide any arguments or support on this point.  Pet. at 13-14.  Based on I.P.'s testimony
6  that when he was in middle school, Petitioner, a man he loved and viewed as a father figure
7  and who provided a home and childcare for I.P. and his siblings, sexually abused him on
8  numerous occasions while holding him down, pledging his love, telling I.P. to calm down, and
9  promising not to hurt him, a jury could reasonably determine that I.P. was coerced into
10 performing or acquiescing in acts which he otherwise would not have performed due to a
11 direct or implied threat of hardship or retribution and based upon his "fatherly" and familial
12 relationship with the Petitioner.  See McCarthy v. Koenig, 2020 WL 3962007, at *22 (N.D. Cal.,
13 July 13, 2020) (stating that "[w]hen a victim is young and is molested by her father in the
14 family home, in all but the rarest cases duress will be present" and finding ample evidence of
15 duress "given the father-daughter relationship, appellant's position of authority in the family,
16 the difference in age and size between appellant and Doe, appellant's instruction to keep the
17 abuse a secret, and Doe's testimony about her ongoing fear"); see also Solorzano v. Holland,
18 2018 WL 2222124, at *9 (S.D. Cal., May 11, 2018)  (finding that the Court of Appeal was not
19 objectively unreasonable in upholding petitioner's conviction for the forcible versions of the
20 crimes charged where the victim was "was fourteen years old and faced repeated sexual
21 misconduct by petitioner, her father and caretaker" and "did not report the abuse because
22 she, her mother, and her siblings depended on her father financially and for support").
23 Accordingly, the California Court of Appeal's decision was not based on an unreasonable
24 determination of the facts in light of the evidence presented.  The court's decision also was
25 not "contrary to" nor an "unreasonable application of" clearly established federal law or based
26 on an "unreasonable determination of the facts in light of the evidence presented in the State
27 court proceeding" [see 28 U.S.C. § 2254(d)] and this Court **RECOMMENDS** that Petitioner's
28 Petition be **DENIED** on this ground.

1

        b.  Count 7 – The Charged Act

2          Petitioner also argues that the evidence supporting count 7 was insufficient because it

3    was unclear which question I.P. was answering when the prosecutor asked him "and were you

4    standing in the shower when [Petitioner] used his hand to touch your penis" and I.P.

5    responded "yes."  Pet. at 14.  Petitioner argues that it is speculative to assume I.P.'s "yes" in

6    that context meant anything other than he was standing in the shower.  Id.  Defendant

7    contends that the Court of Appeal's determination was reasonable given the evidence of

8    duress the court discussed and I.P.'s testimony.  Ans. at 25.

9          The California Court of Appeal, the last state court to issue a reasoned decision on this

10   claim, rejected Petitioner's argument on habeas review.  Lodgment 1.  The appellate court

11   explained:

12              Sosa advances a thin argument that IP's testimony is inconclusive as to whether
            the defendant actually touched IP's penis during the shower incident. In the
13           relevant portion of his testimony, IP emphasized he "tried to scoot away from
            him" and the defendant kept "trying to reach for [IP's] penis." The prosecutor
14           then asked, "And were you standing in the shower when [Sosa] used his hand to
            touch your penis?" to which IP replied, "Yes." The defendant asserts that, due to
15           the form of this question, it would be "entirely speculative to say whether the
            testimony meant anything other than: yes I was standing in the shower." We
16           need not speculate to conclude that IP answered affirmatively because the
            question was an accurate description of how this incident took place. Moreover,
17           a reasonable jury could easily conclude he answered yes to both parts of the
            question.
18

19

20   Lodgment 1 at 22-23.

21          I.P. testified that Petitioner touched his penis when I.P. was standing in the shower and

22   trying to scoot away from Petitioner.  Lodgment 7 at 72-75, Lodgment 8, Vol. 1 at 212.

23   Considering all of I.P.'s testimony, there was ample evidence supporting the jury's conclusion

24   that Petitioner sexually abused I.P. in the shower and, therefore, the Court finds that the Court

25   of Appeal reasonably applied the law when it found sufficient evidence supporting count 7.

26   The state court's decision was not "contrary to" nor an "unreasonable application of" clearly

27   established federal law or based on an "unreasonable determination of the facts in light of the

28   evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).    The Court

1   **RECOMMENDS** that Petitioner's Petition be **DENIED** on this ground.

2          c. Counts 17, 18, and 23 - Penetration

3          Finally, Petitioner argues there is insufficient evidence showing that the required

4   penetration occurred for counts 17, 18, and 23.  Pet. at 15; Lodgment 9, Vol. 1 at 52-54.

5   Counts 17 and 18 are predicated on sodomy while count 23 is predicated on sexual

6   penetration but all require penetration.  Id.  Petitioner acknowledges that the testimony in this

7   case is that I.P.'s butthole was touched but argues that since the expert testimony did not

8   place that "testimony in an anatomical context[,]" the evidence is imprecise and insufficient to

9   establish penetration.  Id. at 17.  Respondent notes that I.P. distinguished between the

10  butthole and the outside of his butt in his testimony and contends that the Court of Appeal's

11  determination was reasonable.  Ans. at 29.

12         The California Court of Appeal, the last state court to issue a reasoned decision on this

13  claim, rejected Petitioner's argument.  Lodgment 1.  The appellate court explained:

14  d. Evidence that penetration occurred as to counts 17, 18 and 23

15  The defendant's last argument is that IP's testimony did not clearly establish
16  penetration occurred—which is a necessary element for three of his convictions.
    Counts 17 and 18 (§§ 269, subd. (a)(3), 286, subd. (a)) and Count 23 (§§ 269,
17  subd. (a); 289, subds. (a) and (k)) all require sexual penetration, "however
18  slight."

19  But these statutes do not provide clear definitions or explain precisely what
    constitutes anal penetration. We turn to *People v. Paz* (2017) 10 Cal.App.5th
20  1023 (*Paz*), which gave thorough treatment to this question. In *Paz*, the court
    considered the historical development of the sodomy law and its relation to the
21  other three major sex offenses—rape, oral copulation, and sexual penetration.
    (Id. at pp. 1030-1033.) Relying on the Supreme Court's commentary in *People v.
22  White* (2017) 2 Cal.5th 349, 357 that "the provisions regarding the four major
    sex crimes [substantively] parallel each other," the Paz court reasoned that
23  penetrative thresholds defined in rape law should inform what constitutes
    penetration of the anus. (*Paz*, at p. 1032.) In the context of rape, penetration of
24  the external female genital organs—that is, the outer labia majora—is sufficient
    "even if the rapist does not thereafter succeed in penetrating into the vagina."
25  (*People v. Karsai* (1982) 131 Cal.App.3d 224, 232.) The Paz court went on to
    provide a detailed analysis of the anatomy of the anus and conclude that the
26  outermost part of the perianal skin—marked by the wrinkled or folded dermis
27  that radiates from the anus— is as much a part of the external anal structure as

28

34

> the labia is to the vagina. (*Paz*, at pp. 1034-1035.) Finding "no reason to adopt different penetration rules for the anus and the vagina," it consequently held that there must be "penetration past the buttocks and into the perianal area but [not] penetration beyond the perianal folds or anal margin." (Id. at p. 1038.)
>
> The question before us, then, is whether the testimony elicited at trial would allow any reasonable jury to conclude beyond a reasonable doubt that the incidents IP described involved penetration past the buttocks and of, at a minimum, the perianal folds or anal margin; under *Paz*, nothing more is required. (*Paz, supra*, 10 Cal.App.5th at p. 1038.) The defendant argues IP's testimony was too vague on this point, but we disagree. IP distinguished between touching that occurred to the "outside of the butt" and the "butthole." A jury could reasonably have inferred "outside of the butt" meant buttocks and "butthole" meant anus. That is actually the plain conclusion, given the colloquial meaning of the terms IP used. (See Merriam-Webster's Online Dictionary (2021) http://www.merriam-webster.com/dictionary/butt [as of Jan. 20, 2021], archived at <https://perma.cc/LY3A-KFDF>, and <http://www.merriam-webster.com/dictionary/butthole> [as of Jan. 20, 2021], archived at <https://perma.cc/2MJ3-L6GJ>.) As such, a reasonable jury that credited his testimony could have found there was penetration on all three counts consistent with the Paz court's "broad view of genital boundaries." (*Paz*, at p. 1037.) We sincerely doubt that IP meant to describe another part of the anatomy shy of the anus when he used the term "butthole." Even if that were a possibility, however, the evidence need not "conclusively rule out various scenarios under which defendant might not be guilty." (*People v. Bolden* (2002) 29 Cal.4th 515, 553.) It only needs to support the judgment.
>
> That threshold has been met in this case.

Lodgment 1 at 22-23.

Under California law "[s]odomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the crime of sodomy." Cal. Pen. Code, § 286(a) (Counts 17-18). In addition,

> Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years.

Cal. Pen. Code, § 289(a) (Count 23). As used in this section:

> (1) "Sexual penetration" is the act of causing the penetration, however slight, of

the genital or anal opening of any person or causing another person to so penetrate the defendant's or another person's genital or anal opening for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object.

(2) "Foreign object, substance, instrument, or device" shall include any part of the body, except a sexual organ.

(3) "Unknown object" shall include any foreign object, substance, instrument, or device, or any part of the body, including a penis, when it is not known whether penetration was by a penis or by a foreign object, substance, instrument, or device, or by any other part of the body.

Cal. Pen. Code, § 289(k) (Count 23).

I.P. testified that Petitioner put his finger in I.P.'s butt and touched his butthole, however I.P. was able to push Petitioner's finger away before it went inside his butthole. Lodgment 7 at 76, 87. I.P. also testified that Petitioner tried to use his penis to touch I.P.'s butt on more than one occasion and that Petitioner would put lotion on his penis before trying to put his penis in I.P.'s butt. Id. at 92-93, 109-110. Petitioner also would put lotion on I.P.'s penis, straddle I.P., and try to insert I.P.'s penis into Petitioner's butt. Id. at 97, 139-140. I.P. testified that during one of these instances, his penis touched Petitioner's butthole. Id. at 98.

The Court of Appeal determined that I.P. described incidents that involved penetration past the buttocks and at minimum to the perianal folds or anal margin as required for penetration under People v. Paz, 10 Cal.App.5th 1023 (2017). There is sufficient evidence in the record supporting this determination and this Court will not second guess the Court of Appeal's conclusion that I.P.'s testimony established that penetration occurred pursuant to Cal. Penal Code § 289 was not unreasonable or contrary to law. See Amaya v. Davey, 2019 WL 1028021, at *6 (C.D. Cal., Jan. 29, 2019) ("defer[ring] to the Court of Appeal's determination that penetration of the perianal area is sufficient to establish sexual penetration of the victim's "anal opening" within the meaning of Cal. Penal Code § 289) (citing Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is

not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); and <u>Paz</u>, 10 Cal. App. 5th at 1023 (holding that sexual penetration for purposes of Cal. Penal Code § 286 "requires penetration of the tissues that surround and encompass the lower border of the anal canal—that is, it requires penetration past the buttocks and into the perianal area but does not require penetration beyond the perianal folds or anal margin").

Additionally, the Court is required to review the evidence in the light most favorable to the prosecution.  <u>Ngo</u>, 651 F.3d at 1114–15; <u>see</u> <u>also</u> <u>Coleman</u>, 566 U.S. at 651; <u>Jackson</u>, 443 U.S. at 326.  Here, given I.P.'s testimony, there is sufficient evidence that Petitioner engaged in sexual penetration and sodomy with I.P. in violation of Cal. Pen. Code, § 289.

For the reasons set forth above, the Court finds that the Court of Appeal reasonably applied the law when it found sufficient evidence supporting penetration as required for counts 17, 18, and 23.  The state court's decision was not "contrary to" nor an "unreasonable application of" clearly established federal law or based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).  The Court therefore **RECOMMENDS** that Petitioner's Petition be **DENIED** on this ground.

## C.    <u>Cumulative Error</u>

Petitioner alleges that "even if the Court does not find that either of the primary arguments amounts to a due process violation, when taken together, these errors produced a trial that was fundamentally unfair."  Pet. at 17.  Respondent contends that Petitioner failed to exhaust this claim as he did not raise this claim in state court and is still able to do so.  Ans. at 29-30.  Respondent also contends that the claim is without merit because cumulative error requires multiple trial court errors, and since Petitioner only alleges one trial error, there are not multiple errors to cumulate.   <u>Id.</u>

The Ninth Circuit recognizes that the combined effect of discrete trial errors, even when none of them individually warrants relief, can in some circumstances have a substantial and injurious effect on the jury's verdict.  <u>See</u> <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir. 2007)

(citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 294, 302-03 (1973)); <u>Alcala v. Woodford</u>, 334 F.3d 862, 882-83 (9th Cir. 2003).  Relief for cumulative prejudice necessarily presupposes that the Court will find substantial error occurred in connection with at least one of the petitioner's claims.  <u>See</u> <u>Hayes v. Ayers</u>, 632 F.3d 500, 524 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.") (citation omitted); <u>United States v. Larson</u>, 460 F.3d 1200, 1217 (9th Cir. 2006) (rejecting cumulative error claim where the court discovered no error in the defendants' trial).

Here, Petitioner has not established that any constitutional or trial error occurred in his case.  <u>See</u> <u>supra</u>, Sections A-B. Accordingly, the Court **RECOMMENDS** that Petitioner's cumulative error claim be **DENIED**.

**D.   <u>Order to Show Cause/Evidentiary Hearing</u>**

"Should this Court now decline to consider [Petitioner's] due process claim as a result of the state court's forfeiture ruling, [Petitioner] would respectfully request an evidentiary hearing, as the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented." Pet. at 8.   Petitioner also requests "that this Court issue an order to show cause" or, alternatively, hold[] "an evidentiary hearing to address any facts still in dispute." Trav. at 4.

In <u>Cullen v. Pinholster</u>, 563 U.S. 170 (2011), the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review under 28 U.S.C.§ 2254(d)(1)—whether the state court determination was contrary to or an unreasonable application of established federal law—must be confined to the record that was before the state court. <u>Pinholster</u>, 563 U.S. at 181–82.  The <u>Pinholster</u> Court specifically found that the district court should not have held an evidentiary hearing regarding Pinholster's claims until after the Court determined that the petition survived review under section 2254(d)(1). <u>Id.</u>; <u>see</u> <u>also</u> <u>Gonzalez v. Wong</u>, 667 F.3d 965, 979 (9th Cir. 2011). Here, for the reasons stated above, Petitioner's claims do not survive review under section 2254(d). "[A]n evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief." <u>Barrios v. Sullivan</u>, 2022 WL 203484 at *7 (S.D. Cal., Jan. 24, 2022)

22CV1022-JLS(BLM)

1  (quoting <u>Sully v. Ayers</u>, 725 F.3d 1057, 1075–76 (9th Cir. 2013)).   Accordingly, the Court

2  **RECOMMENDS** that Petitioner's request for an evidentiary hearing be **DENIED.**

3  <u>**CONCLUSION AND RECOMMENDATION**</u>

4  For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Court

5  issue an Order: (1) approving and adopting this Report and Recommendation, and (2)

6  directing that Judgment be entered denying the Petition.

7  **IT IS HEREBY ORDERED** that any written objections to this Report must be filed with

8  the Court and served on all parties no later than **<u>April 7, 2023</u>**.   The document should be

9  captioned "Objections to Report and Recommendation."

10  **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

11  Court and served on all parties no later than **<u>April 21, 2023</u>**.   The parties are advised that

12  failure to file objections within the specified time may waive the right to raise those objections

13  on appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).

14  Dated:  3/17/2023

15  Hon. Barbara L. Major
   United States Magistrate Judge

39

22CV1022-JLS(BLM)